## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RUSSELL ARTRIP,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 2:07cv00023 |
| | ) | |
| | ) | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant. | ) | United States Magistrate Judge |

In this disability case, I vacate the final decision of the Commissioner denying benefits and remand this case to the Commissioner for further consideration consistent with this Memorandum Opinion.

### I. Background and Standard of Review

The plaintiff, Russell Artrip, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Artrip's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

Case 2:07-cv-00023-PMS   Document 19   Filed 03/05/08   Page 1 of 29   Pageid#: 78

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Artrip protectively filed his application for disability on January 10, 2005, alleging disability as of December 17, 2004, due to lupus, hypertension, right hand and shoulder pain, back pain, depression and anxiety. (Record, ("R."), at 42-47, 50, 481.) The claim was denied initially and upon reconsideration. (R. at 26-28, 31, 33-35.) Artrip then requested a hearing before an administrative law judge, ("ALJ"). (R. at 36.) The ALJ held a hearing on August 15, 2006, at which Artrip was represented by counsel. (R. at 477-504.)

By decision dated September 29, 2006, the ALJ denied Artrip's claim. (R. at 14-21.) The ALJ found that Artrip met the nondisability insured status requirements of the Act for DIB purposes through the date of his decision. (R. at 20.) The ALJ found that Artrip had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ also found that the medical evidence established that during the relevant period, Artrip suffered from severe impairments, namely lupus, hypertension, back pain, depression and anxiety, but that he did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ found that

-2-

Artrip's allegations regarding his limitations were not totally credible. (R. at 20.) The ALJ found that Artrip had the residual functional capacity to perform low-stress jobs at the light exertional level[1] that would not require regular interaction with the general public or exposure to direct sunlight. (R. at 20.) Thus, the ALJ found that Artrip was not able to perform any of his past relevant work. (R. at 20.) Based on Artrip's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Artrip could perform, including those of a shipping and receiving clerk, a houseman, a janitor, a hand packer, a nonconstruction laborer, a production machine tender and an assembler. (R. at 20.) Therefore, the ALJ found that Artrip was not disabled under the Act and was not eligible for DIB benefits at any time through the date of his decision. (R. at 21.) *See* 20 C.F.R. § 404.1520(g) (2007).

After the ALJ issued his decision, Artrip pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 6-8.) Artrip then filed this action seeking review of the ALJ's unfavorable decision, which now stands at the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2007). This case is before the court on Artrip's motion for summary judgment filed October 26, 2007, and the Commissioner's motion for summary judgment filed December 28, 2007.

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2007).

-3-

## II. Facts[2]

Artrip was born in 1966, which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). (R. at 42.) He has a college education and past relevant work experience as a special education teacher, a park ranger assistant, a laborer, a maintenance worker, a cutting machine operator and an equipment operator. (R. at 51-52, 56-57, 62-68.) Artrip testified that he last worked as a special education teacher on December 17, 2004, and that he was receiving Virginia Retirement Disability Benefits. (R. at 481.) He testified that he had been treated for hypertension since he was 20 years old. (R. at 486.) He also testified that he had suffered from lupus for five years, with symptoms of chronic fatigue, skin rashes and sun sensitivity. (R. at 489.) Artrip testified that had undergone surgery on his right hand following a work injury in 2002, and that he had difficulty using his right hand and arm repetitively due to numbness and tingling. (R. at 492.) Artrip further testified that he saw a chiropractor for back and neck pain. (R. at 493.) He stated that he had difficulty standing and sitting for long periods of time, as well as difficulty dealing with the public. (R. at 493-94.) Artrip testified that he experienced at least two panic attacks monthly. (R. at 494.) However, he stated that he took Xanax and Wellbutrin, which helped to lessen his symptoms. (R. at 499.)

Robert Spangler, a vocational expert, also was present and testified at Artrip's hearing. (R. at 500-03.) Spangler was asked to consider a hypothetical individual of Artrip's age, education and work experience, who could perform light work, but who

---

[2]Although there are medical records contained in the record dating back to 1991, because the relevant time period for this court's consideration is December 17, 2004, the alleged onset date, through September 29, 2006, the date of the ALJ's decision, only those facts pertinent to that time period are contained in this Memorandum Opinion.

-4-

could perform only low-stress jobs that would not require him to regularly interact with the general public or that would require him to be exposed to direct sunlight. (R. at 500-01.) Spangler testified that such an individual could perform jobs as a shipping and receiving clerk, a hand packer, a nonconstruction laborer, a production a machine tender, an assembler and a houseman. (R. at 501.) The ALJ further asked Spangler to consider the same hypothetical individual, but who had no useful ability to deal with work stresses, no useful ability to relate predictably in social situations, a seriously limited, but not precluded, ability to deal with the public and co-workers, to interact with supervisors and to maintain attention and concentration. (R. at 501-02.) Spangler testified that such an individual could not perform any of the enumerated jobs. (R. at 502.)

In rendering his decision, the ALJ reviewed medical records from Dr. James P. Senter, M.D.; St. Mary's Hopsital; Dr. Thomas M. Bulle, M.D., a cardiologist; Dr. Herbert D. Ladley, M.D., a cardiologist; Dr. S.K.R. Udupa, M.D., an orthopedic surgeon; Dr. S.C. Kotay, M.D.; Bradley D. VanDyke, D.C., a chiropractor; Dr. Ronald Hall, M.D., a dermatologist; Dr. Haider Abbas, M.D.; Dr. Musa Awan, M.D.; Dr. Philip Robertson, M.D.; Dr. Jeffrey P. Callen, M.D., a dermatologist; Dr. Richard M. Surrusco, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Howard Leizer, Ph.D., a state agency psychologist; Dr. Donald R. Williams, M.D., a state agency physician; Jack Henry, D.C., a chiropractor; and Holston Valley Medical Center.

Artrip saw Dr. James P. Senter, M.D., on December 7, 2004, for a follow-up on

his hypertension. (R. at 132.) His blood pressure was 120/90 at that time. (R. at 132.) Dr. Senter noted that Artrip's blood pressure had improved, but that it still "runs high sometimes." (R. at 132.) Artrip reported that his blood pressure would normalize for a short period after taking Xanax. (R. at 132.) Dr. Senter noted that Artrip's affect was normal and appropriate, he had a regular sinus rhythm and his lungs were clear. (R. at 132.) Artrip was diagnosed with hypertension and anxiety and was prescribed Wellbutrin and Xanax. (R. at 132.) A referral to a psychiatrist or psychologist was discussed, and Artrip was advised to discuss this possibility with his cardiologist. (R. at 132.) On December 14, 2004, Dr. Ronald D. Hall, M.D., a dermatologist, noted that Artrip had subcutaneous lupus that was doing "fair." (R. at 264.) There remained some plaques in the temporal areas, the forehead, the preauricular areas, the frontal scalp and the chest. (R. at 264.) Dr. Hall advised Artrip to continue taking Plaquenil, and Artrip received intralesional steroid injections. (R. at 264.) Artrip also saw Dr. Haider Abbas, M.D., on that day. (R. at 280-83.) His blood pressure was 168/110, and he relayed no new problems. (R. at 280.) Dr. Abbas noted that Artrip had lesions on the scalp, forehead and nasal bridge. (R. at 281.) He diagnosed Artrip with subcutaneous lupus erythematosus, ("SCLE"), and advised him to continue Plaquenil. (R. at 282.) Dr. Abbas also diagnosed mechanical back pain with no evidence of radiculopathy, as well as hypertension. (R. at 282.)

On December 16, 2004, Artrip saw Dr. Thomas M. Bulle, M.D., a cardiologist, stating that he had been having quite a bit of difficulty with depression, and Dr. Bulle noted that Artrip was clearly depressed. (R. at 225-26.) Dr. Bulle further noted that Artrip had been struggling with significant elevation of blood pressure, occasionally associated with headache, but no chest pain. (R. at 225.) Lab studies from December

-6-

9, 2004, showed normal renal function. (R. at 225.) Artrip's blood pressure was 170/120 at that time. (R. at 225.) His chest was clear, and he exhibited a normal heart rate and rhythm. (R. at 225.) Artrip's extremities showed no edema, and his pulses were 2+. (R. at 225.) Dr. Bulle diagnosed uncontrolled hypertension. (R. at 225.) He noted that renal artery stenosis and a thyroid condition had been excluded within the previous year. (R. at 225.) Electrolytes and renal function were normal. (R. at 225.) Dr. Bulle prescribed Norvasc and increased Artrip's dosages of Avapro and Toprol. (R. at 225.)

On January 3, 2005, Artrip continued to have difficulty with severe hypertension. (R. at 131.) His blood pressure was 176/120 at that time. (R. at 131.) Artrip noted that he worked a stressful job as a school teacher. (R. at 131.) Dr. Senter's treatment notes reveal that Artrip had a normal and appropriate affect, a regular sinus rhythm, clear lungs and no pedal edema. (R. at 131.) Dr. Senter diagnosed hypertension. (R. at 131.) Artrip was continued on Xanax and was excused from work until February 2, 2005. (R. at 131.) On January 14, 2005, Dr. Senter noted continued problems with hypertension. (R. at 130.) Artrip's blood pressure was 164/120 at that time. (R. at 130.) A physical examination revealed a good range of motion of the neck, a regular sinus rhythm, clear lungs, no cyanosis, clubbing or pedal edema of the extremities and an intact neurological examination with no focal deficits. (R. at 130.) Dr. Senter diagnosed hypertension and anxiety. (R. at 130.)

Dr. Senter also completed a mental assessment on January 14, 2005, finding that Artrip had an unlimited or very good ability to follow work rules, to relate to co-workers, to understand, remember and carry out simple job instructions and to maintain

personal appearance. (R. at 209-11.) He further found that Artrip had a good ability to function independently and a fair ability to interact with supervisors, to understand, remember and carry out detailed, but not complex, job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 209-10.) In all other areas of adjustment, Dr. Senter found that Artrip had a poor or no ability. (R. at 209-10.)

On February 1, 2005, Artrip's blood pressure was 180/126. (R. at 129.) Dr. Senter noted that Artrip's affect was normal and appropriate, he had a regular sinus rhythm, his lungs were clear and he had no pedal edema. (R. at 129.) Dr. Senter diagnosed hypertension, depressive neurosis and anxiety, and he continued Artrip on Wellbutrin and Xanax. (R. at 129.) He excused Artrip from work through March 1, 2005. (R. at 129.) On February 21, 2005, Artip returned to Dr. Bulle's office for a follow-up visit. (R. at 223-24.) Artrip reported that emotional stress seemed to have a significant effect on his blood pressure. (R. at 223.) He further reported a chronic, nagging headache in the frontal area that had been rather frequent since the fall of 2004. (R. at 223.) Artrip stated that he had experienced periodic blurred vision and saw an opthamologist every three months. (R. at 223.) He also noted periodic chest tightness and slight shortness of breath that occurred with anxiety, but denied chest pressure or tightness with exertion. (R. at 223.) A physical examination revealed that Artrip's blood pressure was 184/118 initially. (R. at 224.) However, when retaken, it was 168/110 on the left and 178/112 on the right. (R. at 224.) Artrip's lungs were clear, he had a regular heart rate and rhythm and radial and femoral pulses were 2+. (R. at 224.) Artrip moved all extremities without difficulty or weakness. (R. at 224.) Melanie Martino, a family nurse practitioner for Dr. Bulle, noted that Artrip's

-8-

hypertension remained uncontrolled on multiple medications. (R. at 224.) Dr. Bulle discontinued Toprol, initiated Labetalol and increased Artrip's dosage of hydrochlorothiazide, ("HCTZ"). (R. at 224.) Artrip saw Dr. Musa H. Awan, M.D., an opthamologist, on February 20, 2005, at the referral of Disability Determination Services. (R. at 284.) Dr. Awan noted that Artrip's vision in both eyes was 20/20 with correction. (R. at 284.) He noted ocular hypertension and advised Artrip to follow up in four months for an intraocular tension evaluation to monitor for the possible use of glaucoma drops. (R. at 284.)

On March 1, 2005, Dr. Senter noted that Artrip continued to have severe difficulty with hypertension. (R. at 126.) Artrip's blood pressure was 188/138 at that time. (R. at 126.) Artrip had a normal and appropriate affect, a regular sinus rhythm, clear lungs and no pedal edema. (R. at 126.) Dr. Senter diagnosed hypertension, depressive neurosis and anxiety, and excused Artrip from work through March 30, 2005. (R. at 126.) On March 10, 2005, Artrip again saw Dr. Hall for a follow-up on his lupus. (R. at 394.) Dr. Hall noted lesions on the face, scalp and chest. (R. at 394.) Artrip reported severe itching and burning, and he stated that he wanted to receive steroid injections. (R. at 394.)

On March 17, 2005, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a physical assessment, finding that Artrip could perform light work. (R. at 285-91.) Dr. Surrusco imposed no postural, manipulative, visual or communicative limitations. (R. at 287-88.) He concluded that Artrip should avoid concentrated exposure to extreme temperatures, wetness, humidity, noise, vibration, fumes, odors, dusts, gases and poor ventilation. (R. at 288.) Dr. Surrusco further found that Artrip

-9-

should avoid all exposure to hazards such as machinery and heights. (R. at 288.) Dr. Surrusco further deemed Artrip's allegations only partially consistent with the medical and nonmedical evidence. (R. at 291.) On March 18, 2005, Dr. Hall noted that Artrip's lupus was not doing very well. (R. at 394.) A physical examination revealed large plaques throughout the scalp, as well as some on the temporal areas, nose and chin. (R. at 394.) He changed Artrip's medication to Soriatane, and he administered steroid injections. (R. at 394.) On March 24, 2005, Dr. Hall noted that Artrip's condition was much improved, noting that his lupus was responding nicely to the injections. (R. at 393.) However, bloodwork revealed that his liver enzymes and lipids were elevated. (R. at 393.) On March 30, 2005, Artrip's blood pressure was somewhat improved at 160/112, and he reported that he had been feeling better. (R. at 125.) Dr. Senter again diagnosed hypertension and excused Artrip from work through May 31, 2005, noting that he needed a "stress free environment." (R. at 125.)

The same day, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Artrip suffered from a nonsevere affective disorder and a nonsevere anxiety-related disorder. (R. at 292-305.) Hamilton further opined that Artrip was only mildly restricted in his activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 302.) Hamilton opined that Artrip's mental allegations were only partially credible and that he should be able to perform any level of work. (R. at 305.)

On April 7, 2005, Artrip informed Dr. Hall that steroid injections had "helped tremendously." (R. at 263, 392.) Artrip's bloodwork was within acceptable limits

with a moderately elevated alanine amniotransferase, ("ALT"), at 48.  (R. at 263, 392.)  He was advised to initiate the earlier-prescribed Soriatane.  (R. at 263, 392.)  On April 11, 2005, Artrip noted no syncope or presyncope, and a physical examination revealed a blood pressure of 220/120 in the left arm and 180/90 in the right arm.  (R. at 221.)  Dr. Bulle again diagnosed uncontrolled hypertension.  (R. at 221.)  He increased Artrip's dosages of Norvasc and Labetalol.  (R. at 221.)  Dr. Bulle ordered a magnetic resonance angiogram, ("MRA"), of the renal arteries with a CT scan of the thoracic and abdominal aorta.  (R. at 222.)  On April 19, 2005, Artrip underwent the CT angiography.  (R. at 242.)  It showed no evidence of coarctation, aneurysm or dissection, normal celiac axis, superior mesenteric and inferior mesenteric arteries and normal renal arteries.  (R. at 242.)  Likewise, an MRAof the brain was unremarkable.  (R. at 217.)

On April 21, 2005, Artrip noted that he was doing much better and that the injections had helped.  (R. at 262, 391.)  He denied any side effects from the Soriatane.  (R. at 262, 391.)  A physical examination revealed that Artrip's face was clearing nicely, with some trace erythema on the nose.  (R. at 262, 391.)  Dr. Hall continued Artrip on Soriatane.  (R. at 262, 391.)  On May 5, 2005, Artrip noted that Soriatane had helped with the burning and itching in the scalp, but not with the plaques. (R. at 261, 390.)  He again denied side effects from the medication.  (R. at 261, 390.)  A physical examination revealed multiple plaques on the top of the scalp, frontal scalp and temporal areas.  (R. at 261, 390.)  Artrip was advised to continue the Soriatane for another month, and he received more steroid injections.  (R. at 261, 390.)  On May 16, 2005, Artrip reported experiencing headaches that were severe at times.  (R. at 220.)  He reported no seizures.  (R. at 220.)  Dr. Bulle noted that vascular studies had shown no sign of renal artery stenosis.  (R. at 220.)  Artrip's blood

-11-

pressure was 182/108 at that time. (R. at 220.) However, when retaken, it was 200/120. (R. at 220.) Artrip's chest was clear, he had a normal heart rate and rhythm, he exhibited no lower extremity edema and his pulses were 2+ and symmetric. (R. at 220.) Dr. Bulle diagnosed uncontrolled hypertension and headaches with some vascular component. (R. at 220.) He prescribed Micardis, and he increased Artrip's dosage of Labetalol. (R. at 220.)

An MRA of the brain, taken on May 23, 2005, yielded normal results. (R. at 448.) On May 31, 2005, Artrip's blood pressure was 150/100, which Dr. Senter noted was the lowest that it had been in a long time. (R. at 124.) Artrip had a normal and appropriate affect, a regular sinus rhythm, clear lungs and no pedal edema. (R. at 124.) Dr. Senter diagnosed severe hypertension, uncontrolled, and excused Artrip from work through August 1, 2005. (R. at 124, 368.) On June 2, 2005, Artrip again denied medication side effects. (R. at 260, 389.) He reported some moderate improvement in some of his lesions, while some remained the same. (R. at 260, 389.) Artrip described a burning sensation in the scalp, the left temporal area and the chest. (R. at 260, 389.) Bloodwork revealed that Artrip's triglycerides were over 300, while his liver enzymes had decreased. (R. at 260, 389.) Artrip's ALT was down to 45. (R. at 260, 389.) Dr. Hall noted that Artrip's lupus was "marginally improved." (R. at 260, 389.) He received more steroid injections and was continued on Soriatane. (R. at 260, 389.)

On June 28, 2005, Artrip presented to the emergency department at Holston Valley Medical Center with complaints of hypertension with a headache of three days' duration. (R. at 306-09, 449-50.) Artrip's blood pressure at that time was 200/148. (R. at 307.) A physical examination revealed some arterial narrowing and

-12-

arteriovenous nicking. (R. at 308, 449.) His cranial nerves were intact, and his grips were strong and symmetric. (R. at 308, 449.) Deep tendon reflexes were 2+ and symmetric, and he moved all of his extremities well. (R. at 308, 449.) Artrip had a regular heart rate and rhythm, and his lab work was unremarkable. (R. at 308, 449.) His headache resolved "fairly quickly" in the emergency department without medication. (R. at 308, 449.) He was given Labetalol which decreased his blood pressure slightly. (R. at 308, 449.) The emergency room physician referred Artrip to cardiology. (R. at 308, 449.) He was diagnosed with hypertension and cyphalgia and was given Percocet and Phenergan. (R. at 308-09, 449-50.) Artrip was discharged in satisfactory condition. (R. at 308, 449.)

On July 1, 2005, Artrip saw Dr. Herbert D. Ladley, M.D., one of Dr. Bulle's associates, for an evaluation of his hypertension. (R. at 217-19, 377-79.) Dr. Ladley noted that Artrip had been referred to him after presenting to the emergency department at Holston Valley Medical Center a few days previously. (R. at 217, 377.) Artrip complained of a six-month history of progressive fatigue and episodes of dyspnea when hypertensive associated with shortness of breath. (R. at 217, 377.) Dr. Ladley noted that Artrip had dyslipidemia, for which he was not being treated. (R. at 218, 378.) Artrip's blood pressure was 180/120 at that time. (R. at 218, 378.) He had lupus reaction of the scalp and chest. (R. at 218, 378.) Artrip's lungs were clear, he had a normal heart rate and rhythm, his femoral pulses were 1+ bilaterally and his extremities revealed no clubbing, cyanosis or edema. (R. at 218, 378.) A musculoskeletal examination revealed no kyphosis, scoliosis, atrophy or abnormal movements. (R. at 218, 378.) Artrip exhibited no focal motor or sensory deficits. (R. at 218, 378.) His mood and affect were deemed normal. (R. at 218, 378.) Dr. Ladley noted that a lipid profile from March 2005 showed total cholesterol of 211,

-13-

tryglycerides at 489 and high density lipoprotein, ("HDL"), at 35. (R. at 218, 378.) Dr. Ladley diagnosed Artrip with refractory hypertension with symptoms of headaches and dizziness, dyslipidemia, discoid lupus and anxiety and depression. (R. at 219, 379.)

On July 5, 2005, Artrip complained of lupus worsening on his scalp, back, face and chest. (R. at 388.) Dr. Hall noted that Artrip's lupus continued to flare. (R. at 388.) He was advised to resume Plaquenil and was referred to Dr. Jeffrey P. Callen, M.D., another dermatologist, for a second opinion. (R. at 388.) Artrip received more steroid injections. (R. at 388.) The same day, Artrip saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, for a psychological evaluation. (R. at 310-18.) Artrip informed Lanthorn that he had experienced psychological problems associated with his discoid lupus diagnosis in 2000. (R. at 312.) Artrip reported that he had never received psychotherapeutic or psychiatric treatment. (R. at 313.) However, he reported that he had struggled with difficulties in these areas, particularly since the worsening of his lupus. (R. at 313.) Lanthorn noted that Artrip was well-motivated during testing, and he believed that the results were a valid reflection of Artrip's then-current degree of intellectual functioning. (R. at 314.) Artrip exhibited no signs of ongoing psychotic processes or any evidence of delusional thinking. (R. at 314.) However, Lanthorn noted that Artrip was quite distressed, anxious and depressed. (R. at 314.) He described Artrip's mood as an "agitated depression." (R. at 314.) Artrip reported ongoing anxiety and tension, and he described panic-like episodes associated with difficulty breathing and chest tightness. (R. at 314-15.) Artrip reported that alprazolam had been "quite helpful." (R. at 315.) However, he described generalized anxiety with which he felt like he was "shaking inside and out." (R. at 315.) He reported worrying all of the time and a progressively worsening memory. (R. at 315.)

-14-

Lanthorn administered the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), on which Artrip achieved a verbal IQ score of 101, a performance IQ score of 89 and a full-scale IQ score of 96, placing him in the average range of intelligence. (R. at 315.) Lanthorn diagnosed anxiety disorder with generalized anxiety and panic attacks, a mood disorder with major depressive-like episode and a pain disorder associated with both psychological factors and general medical conditions. (R. at 316.) Lanthorn assessed Artrip's then-current Global Assessment of Functioning, ("GAF"), score at 50.[3] (R. at 317.) Lanthorn deemed Artrip's prognosis guarded, and he noted that Artrip should give some consideration to seeking psychotherapy. (R. at 317-18.)

Lanthorn also completed a mental assessment, indicating that Artrip had an unlimited or very good ability to understand, remember and carry out simple job instructions, a good ability to follow work rules, to understand, remember and carry out detailed, but not complex, job instructions and to maintain personal appearance. (R. at 319-21.) Lanthorn opined that Artrip had a fair ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 319-20.) Lanthorn further opined that Artrip had a poor or no ability to deal with work stresses and to relate predictably in social situations.

---

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health–illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 41 to 50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning." DSM-IV at 32.

-15-

(R. at 319-20.)

On July 26, 2005, Artrip noted itching and burning of the scalp. (R. at 325.) He complained of fatigue, dry eyes, dry mouth, frequent headaches and exacerbation of cutaneous lesions with sun exposure. (R. at 325.) He further complained of arthritis in the metacarpophalangeal, ("MCP"), joints and shoulders. (R. at 325.) A physical examination revealed erythematous papules and plaques notably on the exetensor surfaces of the forearms and proximal arms, the upper back, the scalp and the chest. (R. at 325.) Artrip had annular lesions, most notably on the chest, bilateral temples, vertex of the scalp and left frontal forehead. (R. at 325.) Dr. Callen diagnosed subacute cutaneous lupus erythematosus. (R. at 326.) He prescribed chloroquine. (R. at 326.) Dr. Callen further noted Dr. Awan's diagnosis of ocular hypertension, approaching glaucoma, and he recommended that Artrip follow up with an opthamologist in the next couple of months. (R. at 326.) Artrip underwent an echocardiogram on August 1, 2005, revealing left ventricular hypertrophy, ("LVH"), with wall thickness, but structurally normal valves. (R. at 246, 381-82.) The same day, Dr. Senter noted that Artrip continued to have significant difficulty with hypertension. (R. at 362.) He diagnosed hypertension, depressive neurosis and anxiety. (R. at 362.) Artrip was given refills for Wellbutrin and Xanax, and Dr. Senter excused him from work through October 3, 2005. (R. at 362, 367.) On August 8, 2005, Artrip saw Dr. Bulle for a follow-up on his hypertension. (R. at 372-75.) He denied any headaches, back pain, abdominal pain, chest pain or unusual breathlessness. (R. at 372, 374.) Artrip's blood pressure was 164/104 at that time. (R. at 372, 374.) His chest was clear, he had a regular heart rate and rhythm, he exhibited no edema and his pulses were intact. (R. at 372, 374.) Dr. Bulle diagnosed Artrip with very difficult refractory hypertension with somewhat better control with

-16-

his then-current medication regimen.  (R. at 372, 374.)

On August 9, 2005, Howard Leizer, Ph.D., a state agency psychologist, completed a mental assessment, finding that Artrip was not significantly limited in his ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions and to ask simple questions or request assistance.  (R. at 330-33.)  He further found that Artrip was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others.  (R. at 330-31.)

Leizer also completed a PRTF, finding that Artrip suffered from an affective disorder and an anxiety-related disorder.  (R. at 334-47.)  Leizer opined that Artrip was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, but had experienced no episodes of decompensation.  (R. at 344.)

Case 2:07-cv-00023-PMS   Document 19   Filed 03/05/08   Page 17 of 29   Pageid#: 94

On August 29, 2005, Dr. Donald R. Williams, M.D., a state agency physician, completed a physical assessment, finding that Artrip could perform light work. (R. at 348-54.) Dr. Williams further found that Artrip could frequently climb ramps and stairs, and could occasionally climb ladders, ropes and scaffolds. (R. at 350.) He found that Artrip could frequently balance, stoop, kneel, crouch and crawl. (R. at 350.) Dr. Williams imposed no manipulative, visual or communicative limitations. (R. at 350-51.) He found that Artrip should avoid concentrated exposure to extreme heat and should avoid sun exposure. (R. at 351.) Dr. Williams opined that Artrip's statements were partially credible. (R. at 354.)

On October 5, 2005, Artrip saw Dr. Philip B. Robertson, M.D., a psychiatrist, for an evaluation. (R. at 355-58.) Artrip reported no difficulty performing activities of daily living. (R. at 357.) He stated that he could drive and could walk "fairly well." (R. at 357.) He stated that he was able to perform "a little laundry" and helped his wife with other homemaking tasks. (R. at 357.) Artrip informed Dr. Robertson that he helped his children with homework and made occasional trips to the store. (R. at 357.) He stated that he rarely socialized. (R. at 357.) Dr. Robertson deemed Artrip's mood mildly to moderately depressed with a stable affect. (R. at 357.) Difficulty concentrating was noted, but Dr. Robertson opined that Artrip was of average intelligence. (R. at 357.) The Beck Depression Inventory - Second Edition, ("BDI-II"), was administered, revealing severe depression. (R. at 357.) Dr. Robertson diagnosed Artrip with generalized anxiety disorder, major depressive disorder, single episode, moderately severe, and a then-current GAF score of 60.[4] (R. at 357.) Dr. Robertson opined that Artrip would not be able to tolerate the stress of returning to his job as a special education teacher. (R. at 357.) He further opined that

---

[4]A GAF score of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..." DSM-IV at 32.

-18-

Artrip might benefit from a more aggressive psychiatric treatment for depression and stress management. (R. at 358.) Dr. Robertson recommended Lexapro or Remeron. (R. at 358.) He opined that once Artrip reached maximum medical improvement of his psychiatric condition, he might have the potential to return to a less stressful occupation. (R. at 358.)

On October 3, 2005, Dr. Senter deemed Artrip's affect as normal and appropriate. (R. at 361.) He diagnosed hypertension and anxiety. (R. at 361.) Dr. Senter continued Artrip's Xanax prescription and excused him from work through January 3, 2006. (R. at 361, 366.) On October 4, 2005, Artrip described his scalp and forehead as much less itchy, but he stated that he was having more joint aches. (R. at 387.) Dr. Hall prescribed chloroquine and administered more steroid injections. (R. at 387.) Artrip was seen at VanDyke Chiropractic, P.C., from November 28, 2005, through March 31, 2006. (R. at 437-45.) On November 28, 2005, Artrip saw Bradley D. VanDyke, D.C., a chiropractor, with complaints of arthritis in the right shoulder, lower back and left knee due to lupus. (R. at 443.) His blood pressure was 170/120 at that time. (R. at 441.) A physical examination revealed a decreased range of motion of the dorsolumbar spine. (R. at 441.) He was diagnosed with a neck sprain, a lumbar sprain, a closed dislocation of multiple cervical vertebrae and a closed dislocation of a lumbar vertebra. (R. at 440.) Artrip saw Jack Henry, D.C., another chiropractor, on the same day. (R. at 444-45.) Henry noted that x-rays of Artrip's cervical spine revealed biomechanical alterations, calcification of the thoracic aorta, elongation of the C7 transverse processes bilaterally, uncovertebral and facet arthrosis of the mid and lower cervical spine and degenerative disc disease at the C4-C5 levels of the spine. (R. at 444-45.) X-rays of the lumbar spine revealed spinal biomechanical alterations, facet tropism and facet arthrosis. (R. at 444-45.) The

-19-

treatment notes from VanDyke Chiropractic, P.C., show that Artrip's condition improved, for the most part, through March 31, 2006. (R. at 437-39.)

On December 6, 2005, Artrip stated that he was doing better, and Dr. Hall noted that Artrip's cutaneous lupus was much improved. (R. at 386.) He was advised to continue Quinacrine and chloraquine, and he received more steroid injections. (R. at 386.) On January 3, 2006, Artrip informed Dr. Senter that he was doing a little better since his previous visit, noting that he sometimes got good blood pressure measurements. (R. at 360.) His blood pressure was 120/72 at that time. (R. at 360.) Dr. Senter stated that was the first good blood pressure reading that Artrip had received in a physician's office in a long time. (R. at 360.) He further deemed Artrip's affect as normal and appropriate, and he found that Artrip had a normal heart rate and rhythm, clear lungs and no pedal edema. (R. at 360.) Dr. Senter diagnosed hypertension and anxiety. (R. at 360.) He continued Artrip's Xanax prescription and excused him from work through March 27, 2006, noting that he needed a stress-free environment. (R. at 360.) On February 1, 2006, Artrip stated that he was doing better, noting much less itching and burning. (R. at 385.) His bloodwork was within normal limits. (R. at 385.) Dr. Hall again noted that Artrip's lupus was improved. (R. at 385.) He was advised to continue his medications, and he received more steroid injections. (R. at 385.) On February 8, 2006, Artrip saw Polly Kramer, a physician's assistant to Dr. Bulle, for a follow-up on his hypertension. (R. at 370-71.) Artrip reported doing "fairly well" for the previous three months, noting that his blood pressure had improved. (R. at 370.) At that time, it was 178/130. (R. at 370.) Artrip was diagnosed with essential hypertension, difficult to control. (R. at 371.) On March 27, 2006, Dr. Senter noted that, for the previous few months, Artrip's blood pressure had been doing better. (R. at 359.) However, he noted that Dr. Bulle wanted Artrip

to remain off of work for a few more months to make sure that his blood pressure remained normal. (R. at 359.) Artrip was again diagnosed with hypertension and anxiety, his Xanax prescription was continued, and he was advised to remain off of work. (R. at 359.) On May 1, 2006, Artrip's lupus was doing very well with medication. (R. at 384.) Artrip stated that he was very pleased and denied any medication side effects. (R. at 384.) Dr. Hall advised him to continue his medications, and he received steroid injections. (R. at 384.)

On May 2, 2006, Artrip saw Dr. Bulle for a follow-up. (R. at 446-47.) Dr. Bulle noted that Artrip had been tested for possible renal artery stenosis as well as pheochromocytoma[5] or any other adrenal issues without any findings to suggest any of these. (R. at 446.) He stated that Artrip's blood pressure was relatively labile, running around 140/90 at home, but higher on doctors visits. (R. at 446.) Artrip denied headaches, breathlessness and chest pain, and he exhibited no edema. (R. at 446.) His blood pressure at that time was 180/110. (R. at 446.) A physical examination was unremarkable. (R. at 446.) Dr. Bulle noted multiple lupoid lesions. (R. at 446.) He diagnosed Artrip with poorly controlled, refractory hypertension without evidence of metabolic or renal artery components. (R. at 447.) Dr. Bulle increased Artrip's Micardis and initiated a trial of carvedilol in place of Labetalol. (R. at 447.)

On June 19, 2006, Dr. Senter noted that Artrip was applying for disability and

---

[5]Pheochromocytoma is a usually benign, well-encapsulated, lobular, vascular tumor of chromaffin tissue of the adrenal medulla or sympathetic paraganglia. The cardinal symptoms, reflecting the increased secretion of epinephrine and norepinephrine, is hypertension, which may be persistent or intermittent. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1279 (27th ed. 1988).

needed him to complete a form. (R. at 461.) Dr. Senter's treatment notes reveal another unremarkable physical examination. (R. at 461.) Artrip's affect was normal and appropriate. (R. at 461.) Dr. Senter diagnosed hypertension and anxiety and continued Artrip's Xanax prescription. (R. at 461.) The same day, Dr. Senter completed a mental assessment, finding that Artrip had an unlimited or very good ability to follow work rules, to relate to co-workers, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 452-54.) He found that Artrip had a good ability to function independently, a fair ability to interact with supervisors, to understand, remember and carry out detailed, but not complex, job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability and a poor or no ability to deal with the public, to use judgment, to deal with work stresses, to maintain attention and concentration and to understand, remember and carry out complex job instructions. (R. at 452-53.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2007).

-22-

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated September 29, 2006, the ALJ denied Artrip's claim. (R. at 14-21.) The ALJ found that Artrip had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ also found that the medical evidence established that during the relevant period, Artrip suffered from severe impairments, namely lupus, hypertension, back pain, depression and anxiety, but that he did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ found that Artrip had the residual functional capacity to perform low-stress jobs at the light exertional level that would not require regular interaction with the general public or exposure to direct sunlight. (R. at 20.) Thus, the ALJ found that Artrip was not able to perform any of his past relevant work. (R. at 20.) Based on Artrip's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Artrip could perform, including those of a shipping and receiving clerk, a houseman, a janitor, a hand packer, a nonconstruction laborer, a

-23-

production machine tender and an assembler. (R. at 20.)  Therefore, the ALJ found that Artrip was not disabled  under the Act and was not eligible for DIB benefits at any time through the date of his decision.  (R. at 21.)  *See* 20 C.F.R. § 404.1520(g) (2007).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40   (4th  Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Artrip argues that the ALJ erred by improperly determining his residual

-24-

functional capacity. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-10.) Artrip also argues the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Senter. (Plaintiff's Brief at 10-13.)

The ALJ found that Artrip had the residual functional capacity to perform low-stress light work that did not require Artrip to regularly interact with the general public or to be exposed to direct sunlight. (R. at 20.) I first will address the ALJ's physical residual functional capacity finding. For the following reasons, I find that substantial evidence supports this finding. While Artrip clearly suffers from labile hypertension, the record makes clear that beginning in January 2006, Artrip's blood pressure began to stabilize. Specifically, on January 3, 2006, Artrip informed Dr. Senter that he was doing better, and a physical examination revealed that Artrip had a normal blood pressure of 120/72. (R. at 360.) Again, on February 8, 2006, it was noted that Artrip's blood pressure had improved. (R. at 370.) Artrip stated that he had been doing fairly well for the previous three months. (R. at 370.) On March 27, 2006, Dr. Senter's treatment notes again reveal that Artrip's blood pressure was better. (R. at 359.) Nonetheless, Dr. Bulle wished for Artrip to remain off of work for a few more months to make sure that his blood pressure remained normal. (R. at 359.) On May 2, 2006, Dr. Bulle noted that Artrip's blood pressure readings approximated 140/90 when he was at home, increasing on his visits to his physicians. (R. at 446.) Thus, the record before the court shows improvement of Artrip's blood pressure beginning in January 2006 and continuing through May 2006. I note also Artrip's statement that he obtained better blood pressure readings at home, indicating that he might become nervous at doctor's visits, thereby increasing his blood pressure to a

certain extent.  Further, despite testing, Artrip has suffered no end organ damage as a result of is hypertension.  Also clear from the record is that Dr. Senter's reason for excusing Artrip from work as a school teacher was because stress exacerbated his hypertension.  However, I note that the ALJ took this restriction into consideration when he limited Artrip to the performance of low-stress work.

Further, no treating medical source has placed any exertional restrictions on Artrip.  Moreover, in March 2005 and August 2005, respectively, state agency physicians Drs. Surrusco and Williams found that he could perform light work and that he should avoid all exposure to the sun.  (R. at 286, 349, 351.)  Moreover, the record reveals that after only four months of chiropractic treatment for back and neck pain, Artrip's condition improved.  There is no evidence to suggest that more aggressive treatment for these conditions was warranted, nor did Artrip seek any further treatment.  Lastly, I note that Artrip's daily activities support the ALJ's physical residual functional capacity finding.  In October 2005, Artrip stated that he had no difficulty performing activities of daily living, noting that he could drive, walk "fairly well," perform laundry and other homemaking tasks, help his children with homework and make occasional trips to the store.  (R. at 357.)

For all of these reasons, I find that substantial evidence supports the ALJ's findings with regard to Artrip's physical residual functional capacity.  For the following reasons, however, I find that substantial evidence does not support the ALJ's finding with regard to his mental residual functional capacity.

While the ALJ properly considered Artrip's need to work in a low-stress

environment, as discussed above, there is evidence contained in the record as to the degree of Artrip's other mental limitations that contradicts the ALJ's mental residual functional capacity finding. For instance, Dr. Senter, Artrip's treating physician, has found that he had a poor or no ability in five areas of mental functioning. (R. at 209-10, 452-53.) Two of these areas, the ability to deal with work stresses and the ability to deal with the public, were taken into account in the ALJ's residual functional capacity finding. However, Dr. Senter further found that Artrip had a poor or no ability to use judgment, to maintain attention and concentration and to understand, remember and carry out complex job instructions. (R. at 209-10, 452-53.) Dr. Senter further found that Artrip had a seriously limited, but not precluded, ability to interact with supervisors, to understand remember and carry out detailed, but not complex, job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 209-10, 452-53.) It is true that Dr. Senter is not a mental health professional. However, psychologists Lanthorn and Robertson made similar findings. For instance, Lanthorn found that Artrip had a seriously limited, but not precluded, ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 319-20.) In October 2005, Dr. Robertson noted that Artrip had difficulty concentrating. (R. at 357.) He opined that *if* Artrip was treated more aggressively for depression and stress management, he *might* have the *potential* to return to a less stressful occupation once his psychiatric condition reached maximum medical improvement. (R. at 358.)

Likewise, in August 2005, state agency psychologist Leizer opined that Artrip was moderately limited in the vast majority of work-related mental activities. (R. at 330-31.) He further opined that Artrip experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 344.) While state agency psychologist Hamilton found, in March 2005, that Artrip experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, she did not have the benefit of the psychological evaluation performed by Lanthorn, an examining mental health professional. In fact, Hamilton's assessment was completed only three months after Artrip's alleged onset date. As previously discussed, the ALJ did not outright reject Lanthorn's opinion. He clearly accepted at least part of it, namely the restriction on Artrip's ability to deal with work stresses and to interact with the public. However, the ALJ did not explain why he did not accept the other findings contained in Lanthorn's evaluation. It is well-settled that "the ALJ must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). Also, the ALJ must analyze all of the relevant evidence and sufficiently explain his findings and his rationale in crediting evidence. *Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. The ALJ did not do that in this case. Instead, he merely stated that "the undersigned has evaluated the evidence in a light most favorable to the claimant and given him the benefit of every doubt in accepting the opinions of Dr. Lanthorn and Dr. Robertson that his mental disorders result in limitations in the ability to interact with the public and handle work stresses." (R. at 19.)

I note that these discrepancies between the medical evidence of record and the

ALJ's findings are particularly important given that the vocational expert testified that an individual of Artrip's age, education and work experience, who could perform low-stress light work that would not require him to be exposed to direct sunlight, and who had no useful ability to deal with work stresses, no useful ability to relate predictably in social situations, a seriously limited, but not precluded, ability to deal with the public and co-workers, to interact with supervisors and to maintain attention and concentration would not be able to perform any jobs. (R. at 501-02.)

For all of these reasons, I find that substantial evidence does not support the ALJ's finding regarding Artrip's mental residual functional capacity assessment. I will remand the case to the ALJ for further consideration consistent with this Memorandum Opinion.

## *IV. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, Artrip's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED:        This 5th day of March 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE